127 P.3d 196

Dennis Lyle AKERS and Sherrie L. Akers, husband and wife, Plaintiffs–Respondents,

v.

D.L. WHITE CONSTRUCTION, INC., David L. White and Michelle V. White, husband and wife, Defendants,

and

Vernon J. Mortensen and Martie Mortensen, husband and wife, Defendants–Appellants.

Dennis Lyle Akers and Sherrie L. Akers, husband and wife, Plaintiffs–Respondents,

v.

D.L. White Construction, Inc., David White and Michelle V. White, husband and wife, Defendants–Appellants,

and

Vernon J. Mortensen and Martie Mortensen, husband and wife, Defendants.

Nos. 30795, 30845.

Supreme Court of Idaho, Coeur d'Alene, October 2005.

Dec. 30, 2005.

Jones, Gledhill, Hess, Andrews, Fuhrman, Bradbury & Eiden, Boise, for appellants in case number 30795. Terri R. Yost argued.

Robert E. Covington, III, Hayden, argued for appellants in case number 30845.

Owens, James, Vernon & Weeks, Coeur d'Alene, for respondents. Leander L. James argued.

BURDICK, Justice.

This action arose from alleged trespass and other torts by the Appellants on land owned by the Respondents. The Appellants hold an easement for ingress and egress over portions of the Respondents' property, but following a bench trial the Appellants were

found to have trespassed by exceeding their rights under the easement and by altering a roadway outside of the easement's boundaries. The district court also determined the Appellants had committed various torts against the Respondents and quieted title to disputed portions of the Respondents' land. The Respondents were awarded compensatory damages for the trespass, which were tripled pursuant to I.C. § 6–202, as well as damages for emotional distress, punitive damages, and costs and attorney fees. We vacate the district court's award of damages, costs and attorney fees, and remand for reconsideration of damages, trespass, and the easement rights held by the Appellants.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Respondents, Dennis and Sherrie Akers, (the Akers; used herein as a plural) are owners of real property adjacent to land owned by appellants David and Michelle White (the Whites). The Whites operate D.L. White Construction Company. In turn, the Whites' real property borders on property held by appellants Vernon and Martie Mortensen. (The Whites, the Mortensens, and D.L. White Construction are hereinafter referred to collectively as "the Appellants.")

All the property at issue now owned by the parties was once held by W.L. and Patricia Millsaps (the Millsaps; used herein as a plural). This included all of a parcel known as "Government Lot 2," as well as what for the purposes of this action are referred to as "Parcel A" and "Parcel B." There is a fourth parcel of interest, referred to here as the "Reynolds Property," that is not owned by the parties and was never owned by the Millsaps. The four parcels are rectangular and meet together at a four-way corner. Parcel A is to the southwest. Parcel B is to the northwest. Government Lot 2 is to the northeast, and the Reynolds Parcel is to the southeast. Government Lot 2 is bisected roughly north to south by a county road, Millsap Loop Road. Because the properties meet at a four-way corner, Parcel A and Government Lot 2 do not actually share a border. It is therefore physically impossible to access Parcel A from the county road in Government Lot 2 without also passing through some other property.

In 1966, the Millsaps sold the northern portion of their property, Government Lot 2 and Parcel B, to Vernon and Kathryn Baker (the Bakers). When doing so, the Millsaps reserved in the deed an easement for themselves across the southern part of Government Lot 2. This easement was to allow the Millsaps to access Millsap Loop Road from that portion of their land they retained and continued to farm, Parcel A. By 1966, and possibly much earlier, an access road (the access road) matching the easement ran from Millsap Loop Road, westward across the southern part of Government Lot 2. It then went beyond the western boundary of Government Lot 2 into Parcel B, before turning south into Parcel A. The Millsaps used the access road several times a year for farming and logging access.

In 1967, the Millsaps sold Parcel A to Floyd and Stella Peplinski (the Peplinskis). The deed from the Millsaps to the Peplinskis expressly conveyed along with Parcel A its easement across Government Lot 2. After taking ownership of Parcel A, the Peplinskis used the access road in the same manner as the Millsaps had used it.

In 1979, the Bakers conveyed the southeastern corner of Parcel B and the southwestern corner of Government Lot 2 lying west of Millsap Loop Road—which includes the land through which the access road passes—to Roger and Linda Wilhelm, (the Wilhelms) and Gregory and Barbara Turk (the Turks). In the following year, 1980, the Akers purchased that property from the Wilhelms and Marvin and Betty Wigen, (the Wigens) the Turks' successors in interest. The deed from the Wilhelms and Wigens to the Akers provides that the Akers took their land subject to "easements of record or in view."

After the Akers moved onto their property, they altered the route of the access road at its eastern end where it connects to Millsap Loop Road. Rather than meeting Millsap Loop Road after a sharp turn to the north as before, (the original approach) the altered approach (the curved approach) starts to

turn earlier and curves more gently to the north before meeting the county road. Both the original and curved approaches to the access road are on a triangle of land (the triangle) the ownership of which has been disputed. The Akers' deed to their property, according to the metes and bounds description, does not include the triangle. The triangle, however, is west of Millsap Loop Road, and references in the deed to that road suggest the triangle of land could belong to the Akers.

The Akers eventually quarreled with the Peplinskis over the Peplinskis' use of the access road, leading to the Peplinskis filing a lawsuit. The Peplinski/Akers suit ended in 1994 when the Peplinskis sold their property, Parcel A, to the Mortensens. The Mortensens later sold much of Parcel A, including the portion adjacent to Parcel B, to the Whites.

According to later findings by the district court, the Whites and the Mortensens entered into a business relationship in which they planned to split their land in Parcel A into smaller lots to create a housing development. The court found that in order to accommodate their projected housing development, the Appellants also planned to widen the access road that crossed the Akers' property and connected the Appellants' land to Millsap Loop Road.

In January 2002 or before, the Akers blocked the Appellants' use of the curved approach to the access road and also forbid the Appellants to travel on the western end of the access road, where it passes through Parcel B before connecting to the Appellants' property in Parcel A. The Appellants then brought in heavy equipment, including a bulldozer, to carve a route around the Akers' gate and to otherwise alter the access road. This led to a series of confrontations between the Akers and the Appellants, as well as alleged damage to the Akers' property and alleged malicious behavior by the Appellants.

In response, the Akers filed the instant action for trespass, quiet title, and negligence. Following a bench trial, the district court quieted title in favor of the Akers to the disputed triangle and confirmed to the Appellants an easement 12.2 feet in width

across the Akers' property in Government Lot 2, including an easement across the disputed triangle through the original approach, but not the curved approach, to Millsap Loop Road. Although the district court confirmed the Appellants' easement across part of the Akers' land, the court determined the easement ended at the western boundary of Government Lot 2, and did not cross into the Akers' property in Parcel B. As a result, the easement was ruled to run from Millsap Loop Road to a point very close to, but not actually reaching, the Appellants' property.

The district court also awarded the Akers compensatory damages arising from the Appellants' trespass in the amount of $17,002.85, which was trebled pursuant to I.C. § 6–202 to a total of $51,008.55, to be paid by the Appellants jointly and severally. Sherrie Akers was awarded $10,000 in compensatory damages for emotional distress, also to be paid jointly and severally by the Appellants. Additionally, the Akers were awarded punitive damages in the amount of $150,000 to be paid by the Mortensens, and $30,000 to be paid by the Whites. Finally, the Appellants were determined to be jointly and severally liable to the Akers for costs and attorney fees totaling $105,534.06.

The Appellants filed a timely appeal from that judgment that is now before this Court.

## II. STANDARD OF REVIEW

This Court does not set aside findings of fact unless they are clearly erroneous. *Weaver v. Stafford,* 134 Idaho 691, 696, 8 P.3d 1234, 1239 (2000). We will not disturb findings of fact that are supported by substantial and competent evidence, even if there is conflicting evidence. *Id.* Evidence is substantial if a reasonable trier of fact would accept and rely upon it in determining whether a disputed point of fact has been proven. *Miller v. Callear,* 140 Idaho 213, 216, 91 P.3d 1117, 1120 (2004). "However, this Court freely reviews the question of whether the facts found, or stipulated to, are sufficient to satisfy the legal requirements for the existence of an implied easement or a prescriptive easement." *Davis v. Peacock,* 133 Idaho 637, 640, 991 P.2d 362, 365 (1999).

## III. ANALYSIS

This appeal raises issues concerning easements and ownership of real property, as well as regarding damages arising from trespass and other torts. Because the Appellants argue they are not liable for trespass because they were acting within their easement rights, and also that the Akers do not own a portion of the property allegedly damaged, we turn first to ownership and easement issues before discussing trespass and damages.

### A. Easement And Disputed Ownership

There are three different areas through which the access road at issue passes. Each of these areas requires a different analysis to determine what rights the Appellants may or may not possess in that area. The first area to consider is the disputed triangle area that lies at the eastern end of the access road, where Millsap Loop Road connects to the access road. In addition to their easement argument, the Appellants also contest the Akers' ownership of the triangle. The second area to consider is the central section of the access road, where it passes through the Akers' property in Government Lot 2 west of the triangle. The third area is the western end of the access road, where, still on the Akers' property, it passes beyond the western boundary of Government Lot 2 and enters Parcel B before hooking south into the Appellants' land in Parcel A. We will consider each area in turn.

### 1. The Disposed Triangle

■ The dispute concerning ownership of the triangle of land at the eastern end of the access road stems from a discrepancy in the deed to the Akers' property. The Akers' deed, as well as that of their predecessors in interest, the Wilhelms and Turks, refer to the centerline of the "County road" (Millsap Loop Road is the only county road nearby) as the eastern boundary of their property. However, the deeds also provide a metes and bounds description, and that description does not match the actual physical location of the road. Testimony presented at trial established that a property survey conducted in 1980 erred in its description of Millsap Loop Road, showing a sharp turn where there was—and still remains—a gradual curve in the road. The divergence between the metes and bounds description and the actual road creates a disputed triangle of land the Appellants claim was never conveyed to the Akers. Ownership of the triangle is especially significant, according to the Appellants, because much of the Akers' claimed trespass damages took place in the disputed triangle. If the Akers did not own the triangle, the Appellants argue, the Appellants are not liable to the Akers for trespassing there.

Formerly, the land in the triangle was owned by the Millsaps, who then sold it to the Bakers along with the rest of Government Lot 2 and Parcel B. (The disputed triangle is entirely within Government Lot 2.) The Bakers sold land west of Millsap Loop Road to the Wilhelms and the Turks, who in turn sold to the Akers in 1980. In 1984, Kathryn Baker conveyed land on the other, eastern, side of Millsap Loop Road, including the land directly east of the Akers' property, to Robert and Dolly Kelch (the Kelches). Later, after the filing of the instant suit, Kathryn Baker quitclaimed any remaining interest she might have had in the disputed triangle to the Mortensens. The Kelches quitclaimed any interest they might have had west of Millsap Loop Road to the Akers.

The Appellants contend that because the metes and bounds description is clear, the Akers' deed unambiguously excludes the Akers from ownership of the disputed triangle and ownership of the triangle is in "hiatus." Alternatively, the Appellants argue that because the land in the triangle was never conveyed by the Bakers to the Wilhelms and Turks, the Akers predecessors in interest, ownership of the triangle remained with the Bakers until being passed by quitclaim deed to the Mortensens.

■ Under Idaho law, physical features existing on the ground and referred to in the deed must be considered when construing that deed. *Miller,* 140 Idaho at 216, 91 P.3d at 1120. References to monuments control over conflicting calls for courses and distances if the monument is of a permanent

nature and established with reasonable certainty. *Id.* at 217, 91 P.3d at 1121. "[A] monument is generally considered to be a permanent, visible and identifiable physical feature." *Weaver*, 134 Idaho at 697, 8 P.3d at 1240.

In the instant case, the dispute over the triangle of land arises from a discrepancy between the calls for courses and distances in the Akers deed and the deed's references to the "County road." The district court found Millsap Loop Road to be an identifiable monument whose location had not changed since the drafting of the deeds and correctly ruled that the references to the road in the deeds controlled over the conflicting calls for courses and distance, thereby eliminating any uncertainty regarding ownership. Consequently, the district court determined there was no "hiatus" in ownership of the triangle because it was properly conveyed by deed first to the Wilhelms and Turks, and later to the Akers. The district court's reasoning was sound, and this Court affirms the judgment quieting title over the disputed triangle area to the Akers.

### 2. The Easement Across Government Lot 2

In the property deed conveying Government Lot 2 and Parcel B to the Bakers, the Millsaps expressly reserved an easement across the southern portion of Government Lot 2 for ingress and egress to adjoining property. This express easement reserved by the Millsaps ran with Parcel A, the dominant estate, and was conveyed along with it to the Peplinskis and eventually to the Appellants. The district court confirmed the Appellants' express easement by reservation across the southern portion of Government Lot 2, including through the disputed trian-

gle. The parties do not appeal this determination.

### 3. The Easement In The Southeastern Corner Of Parcel B

Although the district court confirmed the Appellants' easement rights across Government Lot 2, the court held that the easement ends at the western boundary of Government Lot 2 and does not pass into Parcel B. Because Government Lot 2 only abuts the Appellants' Parcel A property at a corner, they do not share a border. Or, to put it another way, they share a border but that border is infinitely small. As a result, the district court's ruling that the Appellants' easement does not continue into the Akers' land in Parcel B results in an easement that crosses much of the Akers' property but stops just short of providing the Appellants with access to the county road.

When discussing the *access road* and the Appellants' *easement*, it is important to distinguish between the two. When the district court determined the Appellants' easement ended at the western boundary of Government Lot 2, it was articulating a conclusion of law regarding the easement, not a finding of fact regarding the location of the access road itself. With respect to the actual access road, the district court found that it does pass through Parcel B.[1] In finding of fact number 26, the district court found that by 1966 the access road left the western boundary of Government 2, entered Parcel B, and then turned south into Parcel A. The court also found the access road in Parcel B has since been expanded twice, first by the Peplinskis "well after 1980," and more recently by the Mortensens.

The Appellants contend their easement rights follow the access road through the southeast corner of Parcel B to their proper-

1. In finding of fact number 26, quoted here in relevant part, the district court found:

William Reynolds testified that after the "road" left the west boundary of Government Lot 2, it turned sharply in a 90 degree bend then went south, essentially right around the northwest corner of Reynolds' land. This is corroborated by Defendants Exhibits D41 (map from photos taken in 1978) D42 (represented by Mr. Reagan as a 1973 aerial photo), D43 (represented by Mr. Reagan as a 1973 map)

and D44 (represented by Mr. Reagan as a 1973 aerial photo), and thus, this Court finds this to be the approximate route of the "road" in 1966.

Leaving the western boundary of Government Lot 2 equals entry into Parcel B. Traveling south into Parcel A can only be done after passing through Parcel B. The referenced exhibits show the access road passing through Parcel B before turning south into Parcel A as described by the district court.

ty, and they present three different theories in support of this contention: (1) express easement, (2) implied easement from prior use, and (3) easement by prescription. We will consider each of them.

### a. Express Easement

■■■ An easement is the right to use the land of another for a specific purpose that is not inconsistent with the general use of the property by the owner. *Hodgins v. Sales,* 139 Idaho 225, 229, 76 P.3d 969, 973 (2003). "One who purchases land expressly subject to an easement, or with notice, actual or constructive, that it is burdened with an existing easement, takes the land subject to the easement." *Checketts v. Thompson,* 65 Idaho 715, 721, 152 P.2d 585, 587 (1944). An express easement may be by way of reservation or by exception. 7 THOMPSON ON REAL PROPERTY, THOMAS EDITION § 60.03(a)(2)(i) (David A. Thomas ed., 1994). An express easement by reservation reserves to the grantor some new right in the property being conveyed; an express easement by exception operates by withholding title to a portion of the conveyed property. *Id.*

The deed from the Millsaps to the Bakers, the Akers' predecessors in interest, contains an unambiguous express easement by reservation, reserving an easement across the southern portion of Government Lot 2. The deed conveying the property to the Akers states that they took subject to "easements of record" and also specifically referenced the Millsaps–to–Baker deed. However, as the district court noted, by itself the express easement by reservation across the southern portion Government Lot 2 takes the easement no further west than the western boundary of Government Lot 2.

■■■ The Appellants next direct our attention to language in the Akers' deed stating that they took their property subject not only to easements "of record," but also those "in view." Because the access road across the Akers' property, including that property in Parcel B, was "in view" to the Akers at the time of purchase, the Appellants contend the Akers took subject to an express easement by exception.

However, the deed language the Appellants point out to us is not evidence of a grantor's intent to reserve or except an easement. Instead, the language in the Akers' deed discussing easements "in view" was an attempt to create an exception to the grantor's warranties of title and quiet enjoyment and thereby limit the grantor's potential liability. As a result, we must look instead to the other theories raised by the Appellants to determine if they possess an easement connecting their property with Government Lot 2.

### b. Implied Easement From Prior Use

■■■ The Appellants argue they hold an easement over the whole of the access road by an implied easement from prior use. A party seeking to establish an implied easement from prior use "must demonstrate three essential elements: (1) unity of title or ownership and subsequent separation by grant of the dominant estate; (2) apparent continuous use long enough before separation of the dominant estate to show that the use was intended to be permanent; and (3) the easement must be reasonably necessary to the proper enjoyment of the dominant estate." *Davis,* 133 Idaho at 642, 991 P.2d at 367.

In the present case, it is undisputed that all the property in question was once in the common ownership of the Millsaps, establishing the necessary "unity of title or ownership." It was separated in 1966, with the Millsaps retaining ownership over the dominant estate. That established the needed "subsequent separation by grant of the dominant estate." As a result, the first element has been met.

■■■ Regarding the second element, apparent continuous use, the district court wrote in its conclusions of law that there was "no evidence" of such use, then that there was "little testimony" regarding the use of the access road. However, testimony on the Millsaps' farming use of the access road at the time of separation was provided by long-time neighbor and witness for the Akers, William Reynolds as well as William A. Millsap, a witness for the Appellants and the son of W.L. and Patricia Millsaps, the common

grantors.[2] This farming use was consistent with the nature of the property at the time. The testimony of the Millsaps' use of the road at the time of severance was uncontradicted and was even accepted by the district court in its findings of fact when the court stated in finding number 19 that in 1966 "[t]he easement was used primarily for cultivating in May–June and haying in July–August," and in finding number 20 that the access road was used by the Millsaps "about six times a year...." The district court's own findings of fact show the easement was in regular use by the Millsaps, the original grantors, at the time of severance of the dominant and servient estates.

▆ In its decision issued on reconsideration, the district court applied different reasoning, ruling that the appellants failed to show "apparent continuous use" of the access road because they had not proven that *in 1948* the access road crossed into Parcel B. However, the time that is legally relevant to the question of "apparent continuous use" is the time the dominant and servient estates were severed. *Davis,* 133 Idaho at 642, 991 P.2d at 367. In this case, that was in 1966, not 1948.[3] Although the district court made no findings as to the location of the access road in 1948, it found that by 1966 the access road passed through Parcel B and was in regular use by the common grantors, the Millsaps. As a result, the district court's conclusion that there was no "apparent continuous use" by the common grantors at the time of severance is incompatible with its findings of fact and is therefore reversed.

▆ The third element requires the party claiming an implied easement from prior use to show the easement to be "reasonably necessary" for the proper enjoyment of the dominant estate. With respect to an implied easement from prior use, under Idaho law "reasonable necessity is something less than the great present necessity required for an easement implied by necessity." *Davis,* 133 Idaho at 643, 991 P.2d at 368. When determining whether such "reasonable necessity" existed, a court does not look to the present moment, but instead determines whether reasonable necessity existed at the time the dominant and servient estates were severed. *Id.* at 642, 991 P.2d at 367. Once an implied easement by prior use is found to have existed at the time of severance, it "is not later extinguished if the easement is no longer reasonably necessary." *Id.* at 643, 991 P.2d at 368. "[A]n implied easement by prior use is appurtenant to the land and therefore passes with all subsequent conveyances of the dominant and servient estates." *Id.*

In the instant case, the district court reasoned that because Vernon Mortensen testified that he recently had a "back way" to access his parcel A property through other property he had purchased (but since sold), the Appellants' use of the access road across the Akers' property was not "reasonably necessary." The district court's finding of fact that a "back way" recently existed does not support its conclusion of law. The legally relevant time period for the creation of an easement implied from prior use is the time of the severance of the dominant and servient estates. *Id.* at 642, 991 P.2d at 367. In this case, the relevant time period would therefore be 1966, not the present day.

Because the district court made no findings of fact useful to the resolution of whether in 1966 use of the access road through Parcel B was "reasonably necessary" to the enjoyment of the dominant estate, we remand the question to the district court for additional fact finding. Because the first two elements of an easement implied from prior use have been satisfied, if such reasonable necessity is found an easement appurtenant to the dominant estate will be determined to have been established at the time of severance.

2. The record conflicts regarding the spelling of "Millsaps," the alternative being "Millsap." This decision generally uses "Millsaps" because that is how W.L. and Patricia Millsaps signed their name on the property deeds in the record. At trial, however, William A. Millsap gave his name as "Millsap." Additionally, the maps included in the record spell "Millsap Loop Road" without an "s" following "Millsap," and so this decision uses that spelling when referring to the road.

3. 1948 was the year the Millsaps added Parcel B to their holdings, thereby *creating,* not severing, the common ownership of the properties at issue here.

### c. Easement By Prescription

 In addition to the preceding theories, the Appellants also argue they are entitled to an easement along the whole of the access road by prescription. A party seeking to establish the existence of an easement by prescription "must prove by clear and convincing evidence use of the subject property, which is characterized as: (1) open and notorious; (2) continuous and uninterrupted; (3) adverse and under a claim of right; (4) with the actual or imputed knowledge of the owner of the servient tenement (5) for the statutory period." *Hodgins*, 139 Idaho at 229, 76 P.3d at 973. The statutory period in question is five years. I.C. § 5-203; *Weaver*, 134 Idaho at 698, 8 P.3d at 1241. A claimant may rely on his own use, or he "may rely on the adverse use by the claimant's predecessor for the prescriptive period, or the claimant may combine such predecessor's use with the claimant's own use to establish the requisite five continuous years of adverse use." *Hodgins*, 139 Idaho at 230, 76 P.3d at 974. Once the claimant presents proof of open, notorious, continuous, uninterrupted use of the claimed right for the prescriptive period, even without evidence of how the use began, he raises the presumption that the use was adverse and under a claim of right. *Wood v. Hoglund*, 131 Idaho 700, 702–03, 963 P.2d 383, 385–86 (1998); *Marshall v. Blair*, 130 Idaho 675, 680, 946 P.2d 975, 980 (1997). The burden then shifts to the owner of the servient tenement to show that the claimant's use was permissive, or by virtue of a license, contract, or agreement. *Wood*, 131 Idaho at 703, 963 P.2d at 386; *Marshall*, 130 Idaho at 680, 946 P.2d at 980. The nature of the use is adverse if "it runs contrary to the servient owner's claims to the property." *Hodgins*, 139 Idaho at 231, 76 P.3d at 975. The state of mind of the users of the alleged easement is not controlling; the focus is on the nature of their use. *Id.* at 231–32, 76 P.3d at 975–76.

 In the present case, the Appellants established the necessary use of the access road from the time of the separation of the servient and dominant estates in 1966, at least until the Peplinskis' sale of Parcel A to the Mortensens in 1994. The district court nonetheless ruled on two grounds that no prescriptive easement arose. The first of these grounds was that, until recently, the Akers had given permission for the use of the access road, and this permission defeated the formation of any prescriptive easement. The difficulty with that reasoning is that the Akers did not purchase the property across which the access road passes until 1980. Consequently, they were not in a position to grant or deny permission to use the access road before that time. The Appellants contend that an easement by prescription arose during the time from 1966 to 1980, regardless of events after the Akers took possession of their property. If such an easement arose in favor of the dominant estate, it ran with the land that is now held by the Appellants. *Hodgins*, 139 Idaho at 230, 76 P.3d at 974. Once a prescriptive easement has been established, "discussion of permissive use afterwards is unnecessary." *Gibbens v. Weisshaupt*, 98 Idaho 633, 637, 570 P.2d 870, 874 (1977). The district court, unfortunately, did not determine whether the use of the access road by the Peplinskis, the Appellants' predecessors in interest, was adverse or only with the permission of the Akers' predecessors in interest, the Wilhelms and Turks, the Wigens, and the Bakers.

 The second reason given by the district court was that until the Appellants' recent actions giving rise to the present suit, there were "no problems" between the Akers and Appellants, Dennis Akers and Floyd Peplinskis were "friends," and therefore "even if no permission was articulated by Akers" neither the Peplinskis' nor the Appellants' use of the access road was adverse. The district court's reasoning, however, is incorrect. Because the Appellants have already presented proof of open, notorious, continuous, and uninterrupted use of the claimed easement for the prescriptive period, they are entitled to a *presumption* of adverse use. *Wood*, 131 Idaho at 702–03, 963 P.2d at 385–86. It is the Akers' burden, as the owners of the servient tenement, to overcome that presumption. *Id.* at 703, 963 P.2d at 386. Moreover, "mere inaction and passive acquiescence is not a sufficient basis for proving

that the use of the claimed right was with the permission of the owner of the servient tenement." *West v. Smith*, 95 Idaho 550, 557, 511 P.2d 1326, 1333 (1973). The Akers' passive acquiescence cannot establish that the Appellants' or the Peplinskis' use was permissive, because such acquiescence is equally consistent with recognition of the users' claim of right. As a result, the second ground given by the district court also does not support its conclusion that no prescriptive easement was ever formed.

Because the district court did not consider whether an easement by prescription across the Akers property arose during the period from 1966 to 1980, that question is to be resolved by the district court on remand.

### 4. Scope And Width Of The Easement

 The district court ruled in this case that the Appellants' easement across the southern portion of Government Lot 2 is 12.2 feet in width and is not limited to agricultural use. The Appellants argue the easement is much wider than 12.2 feet.

 "An instrument granting an easement is to be construed in connection with the intention of the parties and circumstances in existence at the time the easement was given and carried out." *Argosy Trust ex rel. Its Trustee v. Wininger*, 141 Idaho 570, 572, 114 P.3d 128, 130 (2005). "That intent is a question of fact, and the trial court's findings on the issue will not be disturbed on appeal if supported by substantial and competent evidence." *Id.*

In this case, the district court determined the scope and width of the easement in question based on substantial and competent evidence. For the district court's finding that the express easement was not limited in scope to agricultural use, the district court had the broad reservation language of the deed from the Millsaps to the Bakers. With respect to the finding that the Appellants' easement was only 12.2 feet in width in 1966, the district court relied on its own first-hand examination of the property in the company

of counsel of the parties and testimony establishing 12.2 feet as the "traveled surface" of the access road. This evidence is contradicted, but evidence may be substantial and competent even if there is contradictory evidence on the record. *Weaver*, 134 Idaho at 696, 8 P.3d at 1239. Therefore, this Court affirms the district court's determination of the scope and width of the express easement across Government Lot 2. We express no opinion as to the width or scope of any possible easement by prescription or implied from prior use, leaving that to be resolved by the district court on remand.[4]

### B. Trespass And Damages

The question of whether and to what degree the Appellants' conduct constituted trespass on the Akers' property is intertwined with the question of the scope and boundaries of the Appellants' easement. Similarly, the question of damages flowing from the Appellants' conduct is also inseparable from consideration of the Appellants' easement rights. Because the district court will determine the Appellants' easement rights on remand, we vacate the damage awards granted below. In light of its conclusions regarding the Appellants' easement, the district court may award appropriate damages, if any, necessitated by the Appellants' conduct.

### C. Attorney Fees Below

#### 1. Apportionment

 Idaho Code § 6–202 provides that a trespasser is liable for attorney fees to a prevailing plaintiff who brings an action to enforce the terms of that section. In this case, the district court awarded attorney fees to the Akers as the prevailing plaintiff pursuant to I.C. § 6–202.

 The Appellants contest this award of attorney fees, arguing the district court erred in failing to apportion fees. The Appellants argue the district court should at most have awarded attorney fees under I.C. § 6–202 for the Akers' trespass claims, not

---

4. It is not only possible that an easement by prescription or implied from prior use exists in Parcel B, but also that easements exist under one or both of those theories in Government Lot 2 concurrent with the Appellants' express easement. Any concurrently existing easements may have different boundaries or scope than the express easement.

its other claims, such as for quiet title. In response, the Akers contend the Appellants failed to raise this issue below. The Appellants' reply briefs do not contest the Akers' assertion. This Court will not consider issues raised for the first time on appeal. *McCray v. Rosenkrance,* 135 Idaho 509, 516, 20 P.3d 693, 700 (2001). Accordingly, we will not consider the issue of apportionment of attorney fees under I.C. § 6–202 as it was not raised below.

### 2. The Award Of Costs And Attorney Fees Below

For the same reasons that we vacate the district court's damage awards, we also vacate the district court's award of attorney fees and costs to the Akers.

## D. Attorney Fees On Appeal

The Akers request an award of attorney fees on appeal pursuant to I.A.R. 41, I.C. § 12–121, and I.C. § 6–202. Idaho Appellate Rule 41 provides the procedure for requesting attorney fees on appeal, but is not authority alone for awarding fees. *Shawver v. Huckleberry Estates,* 140 Idaho 354, 365, 93 P.3d 685, 696 (2004). Idaho Code § 12–121 permits an award of attorney fees in a civil action to the prevailing party if the court determines the case was brought, pursued or defended frivolously, unreasonably or without foundation. *Mutual of Enumclaw Ins. Co. v. Pedersen,* 133 Idaho 135, 139, 983 P.2d 208, 212 (1999). The Akers are not the prevailing party on appeal, and therefore no award of attorney fees under I.C. § 12–121 is warranted.

Idaho Code § 6–202 does not expressly provide for attorney fees on appeal, but the Akers argue that where a lower court's award of statutory attorney fees is upheld on appeal, attorney fees on appeal should be awarded as well. We decline to award attorney fees on appeal to the Akers because in this instance the Appellants have raised valid issues necessitating remand to the district court.

### IV. CONCLUSION

We remand this case to the district court for additional fact finding and determination of whether the Appellants are entitled to a prescriptive easement or an easement implied from prior use. The award of damages, costs and attorney fees granted below is vacated. On remand the district court will, in light of its conclusions regarding the Appellants' easement rights, determine whether the Appellants' conduct constituted trespass and award any appropriate damages. No costs or attorney fees are awarded on appeal.

Chief Justice SCHROEDER and Justices EISMANN, JONES and LUSTER, Pro Tem concur.